UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


**STANLEY A. HAGERMAN,**

      Plaintiff,

   v.                              Case No.: 2:16-cv-932
                                    **JUDGE GEORGE C. SMITH**
                                    **Magistrate Judge Jolson**

**AMERICAN ELECTRIC POWER
SERVICE CORPORATION,** *et al.*,

      Defendants.


## OPINION AND ORDER

Plaintiff Stanley A. Hagerman brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132. On August 25, 2017, Hagerman and Defendants American Electric Power Service Corporation and AEP Long-Term Disability Plan (collectively, "AEP") each moved for judgment on the administrative record. (Docs. 22 and 24). Responses have been filed and these motions are now ripe for review. For the following reasons, Hagerman's motion is **DENIED** and AEP's motion is **GRANTED**.

### I.    BACKGROUND

Plaintiff Stanley Hagerman was employed as a senior generation dispatcher by Defendant American Electric Power Service Corporation ("AEP") until February 23, 2015. (Doc. 23, Administrative Record ("AR") 4, 94–98). His position included the following responsibilities:

> Dispatching AEP's generation assets; communication with power plant operators, and other personnel; monitor, record, and report on emission information; directing power plant control room operators to take appropriate action to ensure units are operated to support reliable operation of the Bulk Electric System.

(AR 660).

Hagerman was a participant in the long-term disability plan (the "Plan") offered by AEP. The Plan was administered by AEP and Prudential Insurance Company of America ("Prudential") performed claims administration services for AEP's Plan. The relevant provisions of the Plan are set forth in the AEP Long-Term Disability Plan in the Administrative Record ("AR"), pages 101 through 120. Under the terms of the Plan, long-term disability benefits become available after a participant has been disabled for 1,040 hours of regularly scheduled work (this waiting period is called the "elimination period"), until 24 months following the date of disability, if the participant can establish that she had "an illness or injury that requires the regular treatment of a duly qualified physician that may reasonably be expected to prevent you from performing the material duties of your own occupation with AEP" (the own occupation standard). (Doc. 23, AR 106). If the employee continues to be disabled after the first 24 months (the conclusion of the Plan's "own occupation" period), to continue receiving long-term disability benefits, the Plan requires the participant to establish that he had "an illness or injury that requires the regular treatment of a duly qualified physician and that may reasonably be expected to prevent you from performing the duties of any occupation for which you are reasonably qualified by your education, training and experience" (the any occupation standard). (AR 107).

Pursuant to the Plan, it is Plaintiff's burden to provide proof of his disability. (AR 113) ("When you apply for benefits, you must provide proof of your disability."). The Plan requires "satisfactory, written proof of objective medical information relating to [the applicant's] illness or injury which supports a functional impairment that renders [the applicant] to be disabled." (*Id.* at 111).

The Plan sets forth the rights and responsibilities of Prudential, as the claims administrator responsible for determinations under the Plan's claims and appeals procedures, which include reviewing and processing LTD claims by eligible participants. (AR 113). As claims administrator, Prudential's decisions are final and binding. (AR 117).

**A.  Hagerman's medical conditions**

Hagerman suffered a traumatic head injury in a motor vehicle accident in 1984 when he was 18 years old. (AR 311). He had a seizure shortly following the accident, but was able to prevent further seizures with medication (Tegretol) for about twenty years. (AR 311–12). He experienced a handful of seizures during 2010–13, and then in December 2014, he requested to change to an extended release form of his medication. (AR 126). Hagerman suffered another seizure in January 2015 and was admitted to Mount Carmel East Hospital for several days in February 2015 for Tegretol toxicity resulting from his medication change. (AR 430). Hagerman has not returned to work since his hospital admission on February 23, 2015.

From then on, Hagerman has not experienced any further seizures, but has "zoning out" or "staring" spells and reports problems with his memory. (AR 343). Hagerman has several other chronic conditions, including diabetes, hyperthyroidism, obstructive sleep apnea, epilepsy, and facial swelling and hives caused by allergic reactions. (AR 127, 265).

On March 12, 2015, Hagerman was seen by his primary care physician, Dr. Randolph Schultz, whose progress notes indicate that Hagerman was "to return to work pending next Tegretol level being in therapeutic range. Patient agrees with plan." (AR 358). However, on March 24, 2015, Dr. Schultz issued an Attending Physician's Statement ("APS") stating that Hagerman was disabled for the period of March 23–May 25, 2015, due to "mild cognitive impairment since 2 seizures Feb 2015." (AR 100). In the space for the date Hagerman was released to return to work, Dr. Schultz wrote "N/A." (*Id.*).

3

Dr. Schultz referred Hagerman for a neurological assessment of his epilepsy. (AR 342). The neurological assessment was completed by Dr. Imad Najm on May 11, 2015. (*Id.*). Dr. Najm noted Hagerman's history of seizures and staring spells, describing the latter as "zones and stares off with no associated [loss of consciousness], he can still hear and see what is going on around him and is unable to respond." (AR 343). Dr. Najm's notes also indicate that Hagerman's seizures were now well-controlled with medication, and that "[a]s for the zoning out spells, we are at this time unclear of the etiology of these events. They could be dialeptic seizures, or possibly brief microsleep episodes as a result of his sleep apnea." (AR 346). The staring spells were occurring every day. (*Id.*). Dr. Najm instructed Hagerman not to drive until he was seizure-free for at least six months, and that he should not engage in unsupervised bathing or swimming, use of heavy machinery, or use of sharp moving objects. (AR 346–47).

Hagerman also underwent EEG monitoring for several days from May 7 to May 12, 2015, under the supervision of Dr. Andreas Alexopoulos. (AR 125). During this period, he reported experiencing three seizures, but no change in EEG activity was observed. (AR 128). Hagerman also underwent an MRI, the results of which were normal. (AR 131). In his discharge instructions, Dr. Alexopoulos stated, "[Hagerman] was not cleared to return to work." (*Id.*).

On June 9, 2015, Susan Rojc, PA-C, issued an APS stating that Hagerman was disabled for the period of May 7–August 20, 2015, "at least," and that his return to work date would be determined after an upcoming follow up appointment with Dr. Najm on August 20, 2015. (AR 99). Ms. Rojc left blank the section of the form to explain the reasons for Hagerman's work restrictions, but noted a primary diagnosis of "spells" and a subjective finding of "seizures." (*Id.*).

4

Hagerman saw Dr. Najm for a follow up appointment on August 20, 2015, at which time Hagerman reported continued staring spells and speech problems. (AR 298). Dr. Najm discussed with Hagerman the possibility that his symptoms were caused by conversion disorder. (*Id.*). Dr. Najm also recommended that Hagerman be seen by the Center for Brain Health for further evaluation. (*Id.*).

**B.      Initial denial of disability benefits**

Prudential's claims manager referred Hagerman's file to Dr. Jonathan Mittelman, a board-certified specialist in occupational and environmental medicine, for review on September 25, 2015. (AR 667–69). Dr. Mittelman reviewed the medical records that had been provided to Prudential at that time: records from his February 2015 hospitalization at Mount Carmel East for Tegretol toxicity; Dr. Schultz's progress notes and March 2015 APS; Dr. Najm's May 2015 neurological assessment; records from Dr. Alexopoulos's EEG monitoring in May 2015; Rojc's June 2015 APS; Dr. Najm's notes from the August 2015 follow up appointment. (*Id.*).

Dr. Mittelman concluded that standard post-seizure diagnosis restrictions (including no unsupervised bathing or swimming, no use of heavy machinery, no use of sharp moving objects, and avoidance of heights) were supported by Hagerman's currently available medical records; but the same did not disclose any cognitive testing that would speak to Hagerman's self-reported cognitive changes. (*Id.*). Dr. Mittelman determined that Hagerman's physicians' basis for keeping Hagerman off work was the unclear cause of Hagerman's staring or zoning out spells. (AR 669). In Dr. Mittelman's opinion, Hagerman would be limited in performing his job duties only during his brief staring spells, and although these spells are unpredictable in their frequency, it was unclear whether they would "prevent[ ] him from performing sustainable job duties." (*Id.*). Therefore, "there appears to be no support for it need for such restriction [*sic*]." (*Id.*).

5

Dr. Mittelman also noted that Hagerman had recently undergone a neurological assessment with Dr. Jagan Pillai and was scheduled to undergo neuropsychological testing in November. He listed obtaining records from these assessments as a next step. (*Id.*).

Based on Dr. Mittelman's file review, Prudential denied Hagerman's claim for long-term disability benefits on October 1, 2015. (AR 626–29). In its denial letter, Prudential noted that it had reviewed the medical information from Dr. Schultz and Drs. Najm, Alexopoulos, and Pillai of the Cleveland Clinic. (AR 627). Prudential summarized the contents of these medical records, concluding that Hagerman's medical records did not support impairment that would prevent Hagerman from performing the material and substantial duties of his own occupation. (AR 627–28). Rather, Prudential concluded that the available medical information supported that Hagerman would be limited only during his brief staring spells. (AR 627).

**C.     Hagerman's first appeal**

On December 11, 2015, Hagerman sent a letter to Prudential appealing the denial of disability benefits and enclosing additional medical records for Prudential's review.

Hagerman had undergone a further neurological assessment with Dr. Jagan Pillai at the Center for Brain Health on September 10, 2015. (AR 328). Hagerman's main concerns at this time were "if he can return to work in a power plant and if his speech changes will improve." (*Id.*). Dr. Pillai administered several tests, including the Montreal Cognitive Assessment (on which he scored 22/30), a dementia mental status exam, and a neurological exam. (AR 329–31). Dr. Pillai concluded that Hagerman had deficits in working memory and attention and recommended "neuropsychologic testing to help determine level of disability/ability to work." (AR 331).

On September 25, 2015, Dr. Najm issued an APS stating that Hagerman was disabled for the period of May 7, 2015 to November 30, 2015. (AR 295). By way of explanation, Dr. Najm

6

stated, "cognitive changes being evaluated, work ability to be determined after 11/6/15 testing." (*Id.*). Dr. Najm stated that Hagerman's return to work date would was "to be determined after testing in Nov." (*Id.*).

Hagerman underwent a neuropsychological evaluation with Dr. Aaron Bonner-Jackson at the Center for Brain Health on November 11, 2015. (AR 311). Dr. Bonner-Jackson administered several stand-alone and embedded indices of performance validity and task engagement, which indicated Hagerman "put forth a consistent and credible effort on the evaluation." (AR 313). While Dr. Bonner-Jackson did observe cognitive deficits, he classified them as mild:

> Taken together, results of this exam are suggestive of fairly mild weaknesses primarily affecting frontal-executive cognitive skills. . . . With regard to work, the patient's cognitive profile suggests some inefficiencies that may hinder his performance, and he will likely be more effective with better control of his mood symptoms. As such, he may consider returning to work on a part-time basis (if possible). Should he return to work, he is advised to use any memory and organizational strategies at his disposal to remind him of tasks to complete. Focusing on one task at a time and limiting potential distracters will also be important.

(AR 314).

Hagerman was seen again by Dr. Pillai on November 17, 2015. (AR 332). Dr. Pillai reviewed Dr. Bonner-Jackson's November 11, 2015 neuropsychological evaluation, and, noting the mild cognitive impairments observed in that assessment, stated that "[Hagerman] is cleared to work in some occupations or part time in others for which he has to discuss with occupational medicine at his place of work." (*Id.*).

Contemporaneous with his neurological and neuropsychological assessments, Hagerman was also being seen by Dr. Philip Berger, a family physician, and Premier Allergy for serious allergic reactions including facial swelling and chronic hives. (AR 466–81, 513–35; AR 372–92, 537–86). On December 8, 2015, Dr. Philip Berger issued an APS stating that Hagerman's return

7

to work date was "N/A" due to impairments of "breathing, weakness" and "shortness of breath." (AR 303). Progress notes from a visit with Dr. Berger of the same date noted that Hagerman had recently visited the emergency room due to facial swelling. (AR 513).

Prudential arranged for an independent neuropsychologist to review Hagerman's file (including the new records received in December 2015 and Hagerman's job description) and answer questions about his functional limitations. (AR 634–36). On February 15, 2016, Dr. Glen Getz, a board-certified neuropsychologist, submitted a neuropsychology file review in response to Prudential's referral questions. (AR 180–87). Dr. Getz concluded that, "[t]aken as a whole, the medical records reviewed do not support the claim of the presence of validated mental health difficulties that would have a significant psychological or cognitive impact and result in any medically necessary restrictions and/or limitations from February 2015 through the present time." (AR 185).

Based on Dr. Getz's file review, Prudential sent a letter to Hagerman on February 18, 2016. (AR 639–44). The letter reviewed in detail all of the records reviewed by Dr. Getz and the specific conclusions he reached with respect to those records. (*Id.*). In particular, both Dr. Getz in his file review and Prudential in its February 18, 2016 letter addressed Dr. Bonner-Jackson's neuropsychological evaluation at length, including the raw data from the 12 different cognitive tests administered by Dr. Bonner-Jackson. As noted by Dr. Getz and Prudential, all of Hagerman's scores were in the low-average to average range. (AR 641). Even Dr. Bonner-Jackson, Hagerman's own doctor who determined Hagerman had "mild" cognitive impairments, did not conclude that those impairments required work restrictions. (AR 314). For these reasons, Prudential upheld its initial denial of disability benefits. (AR 643).

8

**D. Hagerman's Second Appeal**

On April 12, 2016, Hagerman's counsel sent a letter to Prudential providing notice of Hagerman's second-level appeal of the denial of benefits and requesting an extension of time for submission of additional medical records for Prudential's review. (AR 337).

On June 14, 2016, Hagerman's counsel submitted a large volume of medical records to Prudential, which largely appeared to be either duplicative of, or providing further detail regarding, Hagerman's February 2015 hospitalization at Mount Carmel for seizures; his May 2015 hospitalization and EEG monitoring at the Cleveland Clinic; progress notes from Hagerman's primary care physician, Dr. Schultz; and Hagerman's treatment by Dr. Berger and Premier Allergy for facial swelling and hives. (AR 210–586). Hagerman's counsel also submitted records indicating that Hagerman was seen by Rachel Falsone, CNP, and Dr. James Fagan beginning in January 2016 for issues related to his obstructive sleep apnea, chronic cough, and allergic reactions. (AR 443–49; AR 450–51, 482–511). Falsone noted that Hagerman's sleep was interrupted frequently, causing excessive daytime sleepiness. (AR 444).

On June 22, 2016, Hagerman's counsel also submitted records related to Hagerman's visit to the Mount Carmel emergency room on March 2, 2106 for facial swelling (which triggered Dr. Berger's initial referral to Premier Allergy). (AR 256–84).

On June 23, 2016, Prudential arranged for an independent panel, consisting of a neurologist with a specialty in sleep medicine and a neuropsychologist, to undertake a file review of all records submitted by Hagerman, as well as Hagerman's job description. (AR 653–55). Prudential specifically requested that the neuropsychologist undertake a further review of the raw data from Dr. Bonner-Jackson's neuropsychological testing. (*Id.*).

The panel review was conducted by Dr. Nick DeFilippis, a board-certified neuropsychologist, and Dr. Len Grinman, who is board-certified in neurology and sleep

medicine. On July 13, 2016, after discussing Hagerman's file with each other, Dr. DeFilippis and Dr. Grinman each submitted separate written evaluations of Hagerman's medical records. (AR 593–611). In particular, Dr. DeFilippis reviewed the raw data from Dr. Bonner-Jackson's neuropsychological assessment and concluded that this assessment "only identified a few scattered low-average/borderline scores with most neuropsychological testing in the average to above average ranges." (AR 598). Dr. DeFilippis further noted it was unfortunate that "Dr. Bonner-Jackson had not administered a measure of personality functioning that could have possibly identified somatization. This was mentioned by the Cleveland Clinic as a possibility after the claimant had video monitoring that did not show EEG changes when the claimant was exhibiting seizure-like activity." (*Id.*).

For his part, Dr. Grinman concluded that Hagerman's "staring episodes" "are not seizures and are not formally impairing" because they "last for seconds and do not preclude working." (AR 610–11). While Dr. Grinman recommended continuation of general seizure precautions (no driving, swimming, use of heavy machinery, etc.), he found "no other evidence of impairment/limitation." (AR 611). Both reviewers ultimately concluded that the records did not support a physical or cognitive impairment that would prevent Hagerman from working for the period of February 24, 2015 onward. (*Id.*).

On July 21, 2016, Prudential sent a letter to Hagerman's counsel informing her that Prudential had once again upheld its denial. (AR 658–61). Prudential concluded that job restrictions related to the seizure diagnosis (no climbing, no working at unenclosed heights, no commercial driving, no sharp objects, and no operation of heavy machinery) were warranted. (*Id.*) However, Hagerman's job description indicated that his occupation is sedentary and does not involve any of the restricted duties. (*Id.*). "Therefore, the medically supported restrictions

and limitations would not prevent him from performing the material duties of his own occupation. As a result, he does not meet the plan's definition of disability . . . ." (AR 661).

On September 27, 2016, Hagerman commenced this action. Both parties have now moved for judgment on the administrative record. (Docs. 22 and 24).

## II. STANDARD OF REVIEW

Hagerman's claim for benefits is governed by ERISA, as amended, 29 U.S.C. § 1132. Section 502(a)(1)(B) gives Hagerman the right, as a participant of the Plan, to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). The Court reviews a challenge to a denial of ERISA plan benefits under a *de novo* standard "unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Under circumstances where the "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the more deferential "arbitrary and capricious" standard of review applies. *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

Prudential argues that the Court should review under the arbitrary and capricious standard, and Hagerman concedes as much. The Plan at issue in this case specifically states:

> [AEP] has delegated its claims administration authority for reviewing and processing LTD claims by eligible participants to a claims administrator. As of January 1, 2009, the Prudential Insurance Company of America ("Prudential") is the plan's claims administrator.

(AR 113).

This Court has previously found that the aforementioned language sufficiently delegates discretionary authority to determine eligibility for benefits. *See Milam v. Am. Elec. Power Long*

11

*Term Disability Plan*, No. 2:11-cv-77, 2012 WL 4364304, *3 (S.D. Ohio Sept. 24, 2012) (Marbley, J.) ("the benefit plan gives the administrator discretion to determine eligibility for benefits or to construe the terms of the plan"). There is no question that Prudential made the final decision regarding Plaintiff's long-term disability benefits. Accordingly, the Court will apply the arbitrary and capricious standard to this case.

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). Under this standard, a court will uphold an administrator's decision if it is rational in light of the plan's provisions. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (citation omitted). "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Id.*; *see also Baker v. UMWA Health & Ret. Funds*, 924 F.2d 1140, 1144 (6th Cir. 1991) ("Applying the abuse of discretion standard in this context requires that the [administrator's] decision be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."). The arbitrary and capricious standard, however, does not require a court to merely rubber stamp the administrator's decision; instead, a court "must exercise review powers." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004).

When conducting its review of a denial of benefits claim, the Court is generally "limited to consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998); *see also Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 457 (6th Cir. 2003). The Court is required to review the plan administrator's decision based on the administrative record and render findings of fact and conclusions of law accordingly. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619

(6th Cir. 1998). In reviewing the record and the administrator's determination, however, the Court will take into consideration (if present) the fact that a defendant is acting under a conflict of interest based on being both the decision-maker, who determines which claims are covered, and the payor of those claims. *Glenn*, 554 U.S. at 115–16; *Johnson v. Conn. Gen'l Life Ins. Co.*, 324 F. App'x 459, 465 (6th Cir. 2009). The weight that a conflict of interest receives is determined by case-specific factors. *Glenn,* 554 U.S. at 116–17 ("[C]onflicts are but one factor among many that a reviewing judge must take into account."); *Johnson,* 324 F. App'x at 465–66.

### III. DISCUSSION

Hagerman asserts that he was and is disabled "primarily due to his cognitive impairments, his seizure and staring spell disorders, and in part due to the medications he is required to take." (Doc. 24, Hagerman's Mot. at 18). He argues that he was wrongfully denied long-term disability benefits by Prudential because: (1) the medical and vocational evidence supports the existence of a cognitive impairment that limited Hagerman's ability to perform the material duties of his occupation; and (2) Hagerman was not afforded a full and fair review. Prudential counters these arguments by asserting the medical evidence does not support Hagerman's claim, and that Prudential afforded Hagerman a full and fair review when it had his medical records reviewed by three independent physicians (Drs. Getz, DeFilippis, and Grinman). The Court will address each argument in turn.[1]

**A.    The medical and vocational evidence**

Hagerman contends "[t]here is no dispute that Mr. Hagerman suffers from: 1) random seizures; 2) epilepsy; 3) cognitive impairments, which affect his judgment, speech and ability to think clearly; and 4) staring spells." (Doc. 24, Hagerman's Mot. at 13). Hagerman also asserts

---

[1] Hagerman also included a count in his Amended Complaint alleging that AEP failed to produce a complete claim file in response to a demand by Hagerman's counsel. (Doc. 11, Am. Compl. ¶ 13). Hagerman has indicated to the Court and AEP's counsel that he no longer intends to pursue this count and therefore it is **DISMISSED**.

that his job "required mental acuity, alertness and the ability to focus. The wide range of symptoms he suffered from multiple disorders prevented him from performing these important, mentally challenging functions." (*Id.*). But unfortunately for Hagerman, his medical records do not support this conclusion—not even according to Hagerman's own treating physicians, Dr. Pillai and Dr. Bonner-Jackson, who both determined that Hagerman's mild cognitive impairments did not prevent him from performing his job.

Further, the Attending Physician Statements asserting that Hagerman was disabled and unable to work during the relevant period lack support. Rojc's APS of June 9, 2015 left blank the section of the form to explain the reasons for Hagerman's work restrictions, stating that his ability to return to work would be evaluated after a follow up appointment with Dr. Najm. (AR 99). Dr. Najm's September 25, 2015 APS stated only that Hagerman's "cognitive changes [were] being evaluated, work ability to be determined after 11/6/15 testing." (AR 295). These two APSs, therefore, do not actually document any occupational impairments, but merely defer any analysis of occupational impairments until further testing could be undertaken. Finally, Dr. Berger's APS of December 8, 2015 based Hagerman's inability to work on "shortness of breath" and "weakness" that were linked to Hagerman's allergy-related conditions, but does not explain how or why shortness of breath or weakness would limit Hagerman's ability to perform his sedentary occupation. (AR 303–05). These conclusory statements that a claimant is disabled without supporting documentation are insufficient to qualify for benefits under the Plan. *Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x 469, 473–74 (6th Cir. 2005) (claims administrator did not "arbitrarily" discredit claimant's doctors' findings of disability when such findings were unsupported by objective medical evidence, as required by the plan); *Jackson v.*

*Metro. Life*, 24 F. App'x 290, 293 (6th Cir. 2001) ("the district court did not err in rejecting the treating physician's conclusory opinion that Jackson could not work again.").

Hagerman further asserts that he told Prudential in his first appeal letter that "AEP HR [ ] notified me that I wouldn't be allowed to return to work" and that Prudential disregarded this information. It is Hagerman's "belief" that, had Prudential followed up with AEP for clarification, AEP "would have advised that Mr. Hagerman's condition created a safety hazard." (*Id.* at 14). But it is Hagerman's responsibility to submit documentation of his inability to work or that his condition created a safety hazard, and he has submitted no evidence from AEP to that effect. As it stands, Hagerman's assertion that his medical conditions created a safety hazard is supported only by his attorney's arguments, and not by the medical records and job descriptions submitted for Prudential's review. The Court therefore cannot consider these arguments at this stage. *Strickrath v. Hartford Ins. Co.*, No. C2-06-1080, 2008 WL 835686, at *1 (S.D. Ohio Mar. 28, 2008) (Sargus, J.) (court could not consider counsel's representations regarding claimant's job duties without documentation in the administrative record); *Madaffari v. Metrocall Companies Grp. Policy GL, H-21163-0, Plan No. 501*, No. 02 C 4201, 2005 WL 1458071, at *12 (N.D. Ill. June 15, 2005) (counsel's letter contained arguments, not undisputed facts, and could not be considered by the court when unsupported in the administrative record).

Hagerman further argues that Prudential "gave insufficient consideration to the possible effects of the medications Mr. Hagerman was taking," which, "at least at some point in time," numbered as high as 20. (Doc. 24, Hagerman's Mot. at 16). But as correctly pointed out by Prudential, the medical records submitted by Hagerman do not speak to any impairment caused by his medications. Nor did Hagerman or his counsel raise the possibility of medication-induced side effects at any point during the administrative process.

Based on the records submitted by Hagerman, the Court does not find that Prudential's substantive evaluation of the available objective, medical evidence was arbitrary or capricious.

**B.    Full and fair review**

In addition to the substance of Prudential's decision that Hagerman was not disabled, Hagerman also challenges the procedural aspects of Prudential's benefits denial. Hagerman contends that his disability, which he characterizes as "primarily due to his cognitive impairments, his seizure and staring spell disorders, and in part due to the medications he is required to take," presents itself in an inherently subjective manner "that [is] not verifiable from a review of records, reports, or test results." (Doc. 24, Hagerman's Mot. at 18–19). As a result, Hagerman argues, Prudential was required to arrange an independent in-person medical examination—not merely have independent physicians review Hagerman's file. (*Id.* at 19).

In making this argument, Hagerman attempts to transform a dispute over objective medical evidence into one of credibility. Because the independent physicians who reviewed Hagerman's files determined he was not disabled, Hagerman concludes that, "[p]ut simply, these physicians did not believe Mr. Hagerman." (*Id.* at 20). While it is true that the Sixth Circuit has raised concerns about physicians making credibility determinations about claimants without ever personally examining them, it does not follow that every file review involves a credibility determination. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 702 (6th Cir. 2014) ("[R]eliance on a file review is inappropriate where a claims administrator disputes the credibility of a claimant's complaints."). Indeed, accepting Hagerman's argument that every adverse benefit determination involves a credibility issue would mean that a claims administrator would *never* be able to rely on a file review in denying benefits. The Sixth Circuit has expressly rejected this result. *McKenna v. Aetna Life Ins. Co.*, 620 F. App'x 445, 450–51 (6th Cir. 2015) ("[T]here is nothing inherently improper with

relying on a file review, even one that disagrees with the conclusions of a treating physician.") (quoting *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 297 n.6 (6th Cir. 2005)).

In this case, all treating and reviewing physicians agree on the extent of Hagerman's impairments: he has a seizure disorder, and he has mild cognitive impairments. As to the former, all treating and reviewing physicians agree that general seizure restrictions (no driving, climbing, using heavy machinery, etc.) should be followed. As to the latter, all treating and reviewing physicians (who provided more than a conclusory statement that Hagerman was disabled) agreed these impairments would not materially interfere with the performance of his occupation as senior generation dispatcher. No one has suggested that Hagerman is malingering or exaggerating the extent of his impairments; the treating and reviewing physicians simply do not think that the impairments, as reported by Hagerman, will interfere with Hagerman's job duties. Therefore, this case does not involve a credibility dispute that requires an in-person independent medical examination.

Finally, Hagerman argues that "it appears that Defendants were operating under a conflict of interest. [AEP] is the plan administrator of the self-insured Plan, and is also responsible for funding the Plan." (Doc. 24, Hagerman's Mot. at 21). If a conflict of interest were present, then it would be a factor for the Court to consider in deciding whether Prudential's determination was arbitrary and capricious. *Glenn*, 554 U.S. at 115–16; *Johnson v. Conn. Gen'l Life Ins. Co.*, 324 F. App'x 459, 465 (6th Cir. 2009). But Hagerman fundamentally misunderstands the type of conflict courts are concerned with. While AEP funds the Plan, and makes determinations about which employees are eligible to participate in the Plan, it has delegated the claims administration process—i.e., the determination of which eligible claimants meet the Plan's definition of disability, thereby entitling them to financial benefits—to Prudential. (AR 113). Thus, it is not

the case that AEP is both the decision-maker, who determines which claims are covered, and the payor of those claims, and therefore no conflict of interest is present.

Accordingly, the Court finds no deficiencies with the procedures used by Prudential in denying Hagerman's claim for benefits.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** AEP's Motion for Judgment on the Administrative Record and **DENIES** Hagerman's Motion for Judgment on the Administrative Record.

The Clerk shall remove Documents 22 and 24 from the Court's pending motions list and close this case.

**IT IS SO ORDERED.**

                                                */s/ George C. Smith*
                                            **GEORGE C. SMITH, JUDGE**
                                            **UNITED STATES DISTRICT COURT**